**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

NORTH CAROLINA RIGHT TO LIFE
COMMITTEE FUND FOR INDEPENDENT
POLITICAL EXPENDITURES; NORTH
CAROLINA STATE POLITICAL ACTION
COMMITTEE; W. RUSSELL DUKE, JR.,
             *Plaintiffs-Appellants,*

       and

BARBARA JACKSON,
                 *Plaintiff,*

       v.

LARRY LEAKE, in his official
capacity as the Chairperson of the
North Carolina Board of Elections;
LORRAINE G. SHINN, in her official
capacity as a member of the North
Carolina State Board of Elections;
CHARLES WINFREE, in his official
capacity as a member of the North
Carolina State Board of Elections;
GENEVIEVE C. SIMS, in her official
capacity as a member of the North
Carolina State Board of Elections;
ROBERT CORDLE, in his official
capacity as a member of the North
Carolina State Board of Elections;
ROY COOPER, in his official capacity
as the Attorney General for the
State of North Carolina; C. COLON
WILLOUGHBY, JR., in his official

No. 07-1454

capacity as District Attorney for Wake County; ROBERT STUART ALBRIGHT, in his official capacity as District Attorney for Guilford County, and as a representative of the class of District Attorneys in the State of North Carolina,
*Defendants-Appellees,*

JAMES R. ANSLEY; COMMON CAUSE NORTH CAROLINA,
*Intervenors-Defendants-Appellees,*

and

KEITH M. KAPP; J. MICHAEL BOOE, in his official capacity as Vice-Chairperson of the North Carolina Bar Administrative Committee; DAVID BENBOW, in his official capacity as a member of the North Carolina Bar Administrative Committee; DAVID YATES BINGHAM, in his official capacity as a member of the North Carolina Bar Administrative Committee; GILBERT W. CHICHESTER, in his official capacity as a member of the North Carolina Bar Administrative Committee; RENNY W. DEESE, in his official capacity as a member of the North Carolina Bar Administrative Committee; JIM R. FUNDERBURK, in his official capacity as a member of the North Carolina Bar

Administrative Committee; JOHN E. GEHRIG, in his official capacity as a member of the North Carolina Bar Administrative Committee; ISAAC HEARD, JR., in his official capacity as a member of the North Carolina Bar Administrative Committee; PATRICIA L. HOLLAND, in her official capacity as a member of the North Carolina Bar Administrative Committee; MARGARET HUNT, in her official capacity as a member of the North Carolina Bar Administrative Committee; MARGARET MCCREARY, in her official capacity as a member of the North Carolina Bar Administrative Committee; DAVID T. PHILLIPS, in his official capacity as a member of the North Carolina Bar Administrative Committee; FRED D. POISSON, SR., in his official capacity as a member of the North Carolina Bar Administrative Committee; DONALD C. PRENTISS, in his official capacity as a member of the North Carolina Bar Administrative Committee; RICHARD ROOSE, in his official capacity as a member of the North Carolina Bar Administrative Committee; JAN H. SAMET, in her official capacity as a member of the North Carolina Bar Administrative Committee; JUDY D. THOMPSON, in

her official capacity as a member of
the North Carolina Bar
Administrative Committee,
                              *Defendants.*

DEMOCRACY NORTH CAROLINA;
AMERICAN JUDGES ASSOCIATION;
CAMPAIGN LEGAL CENTER,
INCORPORATED; CENTER FOR CIVIC
POLICY; DEMOS: A NETWORK FOR
IDEAS AND ACTION; ILLINOIS
CAMPAIGN FOR POLITICAL REFORM;
LEAGUE OF WOMEN VOTERS OF THE
UNITED STATES; LEAGUE OF WOMEN
VOTERS OF NORTH CAROLINA;
PROGRESSIVE MARYLAND; PUBLIC
CITIZEN, INCORPORATED; REFORM
INSTITUTE; S. GERALD ARNOLD; G. K.
BUTTERFIELD; J. PHIL CARLTON;
HENRY E. FRYE; K. EDWARD GREENE;
HARRY C. MARTIN; FRANCIS I.
PARKER; WILLIS P. WHICHARD,
              *Amici Supporting Appellee.*

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
W. Earl Britt, Senior District Judge.
(5:06-cv-00324-BR)

Argued: December 7, 2007

Decided: May 1, 2008

Before MICHAEL and TRAXLER, Circuit Judges, and
James P. JONES, Chief United States District Judge
for the Western District of Virginia, sitting by designation.

Affirmed by published opinion. Judge Michael wrote the opinion, in which Judge Traxler and Judge Jones joined.

## COUNSEL

**ARGUED:** James Bopp, Jr., BOPP, COLESON & BOSTROM, Terre Haute, Indiana, for Appellants. Alexander McClure Peters, Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina; Deborah Goldberg, BRENNAN CENTER FOR JUSTICE, New York, New York, for Appellees. **ON BRIEF:** Anita Y. Woudenberg, Josiah Neeley, BOPP, COLESON & BOSTROM, Terre Haute, Indiana, for Appellants. Roy Cooper, North Carolina Attorney General, Susan K. Nichols, Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina; Suzanne Novak, BRENNAN CENTER FOR JUSTICE, New York, New York; James G. Exum, Jr., Manning A. Connors, SMITH MOORE, L.L.P., Greensboro, North Carolina, for Appellees. Erwin Chemerinsky, DUKE UNIVERSITY SCHOOL OF LAW, Durham, North Carolina; Anita S. Earls, Durham, North Carolina, for Democracy North Carolina, Amicus Supporting Appellees. J. Gerald Hebert, Paul S. Ryan, Tara Malloy, THE CAMPAIGN LEGAL CENTER, INC., Washington, D.C., for American Judges Association, Campaign Legal Center, Incorporated, Center for Civic Policy, Demos: A Network for Ideas and Action, Illinois Campaign for Political Reform, League of Women Voters of the United States, League of Women Voters of North Carolina, Progressive Maryland, Public Citizen, Incorporated, Reform Institute, Amici Supporting Appellees. Bryce L. Friedman, James G. Gamble, Elaine M. Divelbliss, SIMPSON, THACHER & BARTLETT, L.L.P., New York, New York, for S. Gerald Arnold, G. K. Butterfield, J. Phil Carlton, Henry E. Frye, K. Edward Greene, Harry C. Martin, Francis I. Parker, Willis P. Whichard, Amici Supporting Appellees.

## OPINION

MICHAEL, Circuit Judge:

   The plaintiffs, a former candidate for the North Carolina Supreme Court and two political action committees, challenge the constitution-

ality of three provisions of North Carolina's Judicial Campaign Reform Act, N.C. Sess. Laws 2002-158, codified at N.C. Gen. Stat. § 163-278.61 et seq. (the Act). The Act, which became law in 2002, creates a system of voluntary public financing for judicial candidates at the appellate level. The district court denied the plaintiffs' request for a preliminary injunction prior to the 2006 general election and ultimately dismissed the complaint for failure to state a claim. Because we conclude that the challenged provisions are permissible campaign finance regulations and are consistent with the First Amendment, as interpreted by the Supreme Court in *Buckley v. Valeo*, 424 U.S. 1 (1976), and *McConnell v. FEC*, 540 U.S. 93 (2003), we affirm.

I.

North Carolina's Judicial Campaign Reform Act creates a system of optional public funding for candidates seeking election to the state's supreme court and court of appeals. The Act's stated purposes are to "ensure the fairness of democratic elections" and "to protect the constitutional rights of voters and candidates from the detrimental effects of increasingly large amounts of money being raised and spent to influence the outcome of [judicial] elections." N.C. Gen. Stat. § 163-278.61. To further these purposes, the Act creates the North Carolina Public Campaign Fund (the Fund), which distributes public funds to eligible candidates who choose to participate in the system (participating candidates). *Id.* In exchange for the public funds, participating candidates must agree to abide by restrictions on the amount of contributions they accept and the amount of campaign expenditures they make. Those candidates who decline participation (nonparticipating candidates) do not receive public funding and are not bound by the additional restrictions accepted by participating candidates.

In August 2005 the plaintiffs filed an action in U.S. District Court in North Carolina against several state officials connected with the administration and enforcement of the Act (collectively, the state). The complaint asserted that several provisions of the Act were unconstitutional. On October 26, 2006, shortly before the November 2006 general election, the district court denied the plaintiffs' request for a preliminary injunction, reasoning that the plaintiffs were not likely to succeed on any of their constitutional claims. In March 2007 the court

dismissed the plaintiffs' claims for failure to state a claim. The plaintiffs appeal the dismissal order, and our review is *de novo*, *Smith v. Frye*, 488 F.3d 263, 266 (4th Cir. 2007).

## II.

We begin our review by setting forth the particulars of North Carolina's public financing system for judicial campaigns at the appellate level.

As a threshold matter any candidate seeking to participate in the public funding system must meet two statutory conditions. First, the candidate must satisfy the Act's eligibility requirements, which are designed to measure whether the candidate has a base of support in the electorate. *See* N.C. Gen. Stat. § 163-278.64(b). Specifically, a candidate must collect "qualifying contributions" from at least 350 registered voters, and those contributions must total at least thirty but no more than sixty times the filing fee for the office. *Id.* In 2006 a supreme court candidate needed to raise between $37,140 and $74,280.[1] Second, each participating candidate must agree to certain restrictions on campaign fundraising and expenditures, including a limitation of spending to the total of the amounts disbursed from the Fund plus the amounts raised as qualifying contributions. *Id.* § 163-278.64(d).

After satisfying these two conditions, a participating candidate becomes certified to receive public funds. A certified candidate receives an automatic (base) disbursement of public funds if the candidate is opposed in the general election. *Id.* § 163-278.65(b). In 2006 the base amount of funding for a contested state supreme court campaign was $216,650, which equaled 175 times the filing fee for that office. A certified candidate does not receive an automatic disbursement of funds for a primary election, but the candidate may spend in a primary the amounts raised to satisfy the statute's eligibility requirements.

---

[1]These numbers, as well as others throughout the opinion, are calculated based on record information suggesting that the filing fee for a supreme court race in 2006 was $1,238. Our numbers differ slightly from those offered by the plaintiffs, but the difference does not affect the outcome of the case.

Participating candidates are also eligible to receive "matching funds" in specified circumstances.[2] *Id.* § 163-278.67. Eligibility for these funds is triggered when a participating candidate is opposed by a nonparticipating candidate whose "funds in opposition" total more than the trigger amounts specified in the statute. "Funds in opposition" is defined to include the amount any one nonparticipating candidate has raised or spent (whichever is greater) plus the amount that independent entities have spent to support the nonparticipating candidate or to oppose the participating candidate. *Id.* § 163-278.67(a).

The Act provides separate trigger amounts for a primary and general election. In a primary election the trigger amount is defined as sixty times the filing fee for the office sought, *id.* §§ 163-278.62(9), (18); in 2006 the trigger equaled $74,280 for a supreme court campaign. In a general election the trigger amount is equal to the initial disbursement, § 163.278.62(18), which in 2006 was $216,650 for a supreme court campaign. The amount of matching funds disbursed equals the amount by which the nonparticipating candidate's "funds in opposition" exceed the trigger amount, though in both the primary and the general the total amount of matching funds available is capped at two times the trigger amount. *Id.* § 163-278.67(a)-(c).

The Act contains several additional provisions designed to promote the effective administration of the matching funds scheme. For example, a nonparticipating candidate must make an initial report within twenty-four hours after the "total amount of campaign expenditures or obligations made, or funds raised or borrowed, exceeds eighty percent (80%) of the trigger for matching funds." *Id.* § 163-278.66(a). The report must include the campaign's "total income, expenses, and obligations." *Id.* In addition, entities that make independent expenditures supporting a nonparticipating candidate (or supporting or opposing a participating candidate) must file a similar report within twenty-four hours of making total expenditures in excess of $5,000. *Id.* After these initial reports, the candidates and independent entities must

---

[2]A recent amendment substituted the term "matching funds" for "rescue funds," which was used in the original version of the Act. Act to Strengthen the Matching Funds Provision of the Judicial Public Campaign Act, N.C. Sess. Laws 2007-510, § 1(a)-(c). This substitution has no effect on the substance of the Act.

"comply with an expedited reporting schedule by filing additional reports" after receiving (or spending) each additional amount in excess of $1,000. *Id.* § 163-278.66(a).

Finally, in certain defined circumstances the Act bars a nonparticipating candidate from accepting contributions from third parties during the twenty-one days prior to a general election. *Id.* § 163-278.13(e2)(3). The purpose of this ban is "to make meaningful the provisions" of the Act by ensuring the timely distribution of matching funds. *See id.* § 163-278.13(e2). For this reason, the ban applies only if a nonparticipating candidate is opposing a participating candidate, and it applies only to contributions that would cause the nonparticipating candidate to exceed the trigger amounts. *Id.* § 163-278.13(e2)(3). The ban does not prevent nonparticipating candidates from personally contributing or loaning money to their own campaigns. *Id.* § 163-278.13(e2).

## III.

Before reaching the merits, we must consider the state's arguments that the plaintiffs' claims are not justiciable.

## A.

The state argues that two of the plaintiffs — North Carolina Right to Life Committee Fund for Independent Political Expenditures (NCRL-IEPAC or the Independent Expenditure PAC) and North Carolina Right to Life State Political Action Committee (NCRL-SPAC or the Contribution PAC) — lack standing because neither has been injured by the statutory provisions they challenge. Three elements are necessary for standing: (1) the plaintiffs must allege that they have suffered an injury in fact, that is, "an actual or threatened injury that is not conjectural or hypothetical"; (2) the injury must be "fairly traceable to the challenged conduct"; and (3) it must be likely that the injury will be redressed by a favorable decision. *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). The state contends that the plaintiffs have not satisfied the first (injury in fact) requirement.

According to the complaint, NCRL-IEPAC is a political action committee organized for the purpose of making independent expenditures on behalf of political candidates it supports. NCRL-IEPAC alleges that it chose not to make expenditures on behalf of nonparticipating candidates due to a fear that such expenditures might result in the disbursement of matching funds to a participating candidate that the organization opposed. NCRL-SPAC, by contrast, is a political action committee organized for the purpose of contributing money to political candidates it supports. NCRL-SPAC alleges that it would have made contributions to a nonparticipating candidate during the twenty-one days prior to the 2006 general election, but refrained from doing so because of the Act.

The state argues, in essence, that the two organizations' alleged injuries are hypothetical or conjectural rather than actual or imminent. According to the state, the organizations failed to show that they would have actually carried out their plans to make contributions and expenditures. Specifically, the state contends that the Independent Expenditure PAC (NCRL-IEPAC) did not show that it had sufficient funds available to make independent expenditures in amounts that would have triggered the statutory reporting requirements. Similarly, the state questions the Contribution PAC's (NCRL-SPAC's) intent to make contributions during the twenty-one days prior to the 2006 election. In particular, the state points out that the Contribution PAC has not made any contributions to candidates during previous election cycles, including 2006.

The state's arguments lack merit. We have held that a plaintiff may establish the injury necessary to challenge campaign finance regulations by alleging "an intention to engage in a course of conduct arguably affected with a constitutional interest." *Va. Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 386 (4th Cir. 2001) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). Similarly, the Supreme Court has held that "conditional statements" of intent, which allege that a plaintiff would engage in a course of conduct but for the defendants' allegedly illegal action, may be sufficient to demonstrate the required "injury in fact." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 184 (2000). The Court explicitly rejected the argument (comparable to the state's argument here) that such conditional statements of intent are

too speculative to confer standing. *Id.* In this case NCRL-IEPAC and NCRL-SPAC have sufficiently stated their intentions by alleging that they would have made contributions and expenditures but for the challenged provisions. Thus, we conclude that the plaintiffs' allegations are sufficient to establish standing.

B.

The state also argues that the plaintiffs' claims are moot. The third plaintiff, W. Russell Duke, Jr., was a candidate for the state supreme court when this action was filed, and he opted not to receive public funds. Duke ultimately lost the election to the incumbent chief justice, Sarah Parker, who chose to participate in the public financing system. The state argues that Duke's claims are moot because he has not alleged that he will become a candidate for judicial office again in the future. Likewise, according to the state, the claims raised by NCRL-IEPAC and NCRL-SPAC are moot because neither organization has alleged an intent to participate in future election cycles.

We disagree. Duke's claims, as well as those raised by NCRL-IEPAC and NCRL-SPAC, "fit comfortably within the established exception to mootness for disputes capable of repetition, yet evading review." *FEC v. Wis. Right to Life, Inc.* (*WRTL*), 127 S.Ct. 2652, 2662 (2007). In *WRTL* the Supreme Court held that the "capable of repetition, yet evading review" doctrine applied to save a challenge to the constitutionality of the Bipartisan Campaign Reform Act (BCRA) made during the 2004 election cycle. *Id.* at 2662-63. Although the election was over when the case reached the Supreme Court, the Court held that there was a reasonable expectation that the BCRA provisions applied against the plaintiff during the 2004 cycle would be applied against it again in future elections. *Id.* Likewise, in this case, there is a reasonable expectation that the challenged provisions will be applied against the plaintiffs again during future election cycles. In making this determination, we reject, as other circuits have, the argument that an ex-candidate's claims may be "capable of repetition, yet evading review" only if the ex-candidate specifically alleges an intent to run again in a future election. *See Schaefer v. Townsend*, 215 F.3d 1031, 1033 (9th Cir. 2000); *Merle v. United States*, 351 F.3d 92, 95 (3d Cir. 2003); *see also Int'l Org. of Masters, Mates & Pilots v. Brown*, 498 U.S. 466, 473 ("[E]ven though [the respondent] lost the

election [for a labor union office] by a small margin, the case is not moot. Respondent has run for office before and may well do so again."). Thus, we conclude that the plaintiffs' claims are not moot.

IV.

We turn now to the central issue: whether providing public matching funds to participating candidates violates the First Amendment.

A.

Our analysis must begin with the Supreme Court's decision in *Buckley v. Valeo*, 424 U.S. 1 (1976). The Court made clear in *Buckley* that public financing of political campaigns does not, in itself, violate the First Amendment. 424 U.S. at 57 n.65. In fact, the Court observed that the Federal Election Campaign Act's (FECA's) public financing scheme "furthers, not abridges, pertinent First Amendment values" because it "facilitate[s] and enlarge[s] public discussion and participation in the electoral process, goals vital to a self-governing people." *Id.* at 92-93.

Since *Buckley* the circuit courts have generally held that public financing schemes are permissible if they do not effectively coerce candidates to participate in the scheme. *See Daggett v. Comm'n on Governmental Ethics & Election Practices*, 205 F.3d 445, 466-72 (1st Cir. 2000); *Gable v. Patton*, 142 F.3d 940, 947-49 (6th Cir. 1998); *Rosenstiel v. Rodriguez*, 101 F.3d 1544, 1549-52 (8th Cir. 1996); *Vote Choice, Inc. v. DiStefano*, 4 F.3d 26, 38-39 (1st Cir. 1993). A public financing system that effectively mandates participation (and thus effectively prohibits candidates from spending their own funds) would violate *Buckley*'s holding that mandatory limits on the amount a candidate can spend on his own campaign are unconstitutional. *Gable*, 142 F.3d at 948; *see also Buckley*, 424 U.S. at 57 n.65 ("Just as a candidate may *voluntarily* limit the size of the contributions he chooses to accept, he may decide to forgo private fundraising and accept public funding." (emphasis added)). Nonetheless, courts recognize that a public financing system may provide significant incentives for participation without crossing the line into impermissible coercion. *E.g.*, *Gable*, 142 F.3d at 949.

The plaintiffs do not make coercion a central aspect of their arguments, and, indeed, we conclude that North Carolina's public financing system is not unconstitutionally coercive. The incentives to choose public funding, while not insubstantial, are rather modest in comparison to those in similar systems that have been upheld against First Amendment challenges. For instance, the Sixth Circuit upheld a Kentucky campaign finance system that provides a substantially greater advantage to participating candidates than does the North Carolina system. *See Gable*, 142 F.3d at 948-49. Under Kentucky's system a participating candidate can raise up to $600,000 in contributions, which are then matched two-to-one with public dollars for a total cap on campaign expenditures of $1.8 million. *Id.* at 944. If, however, a nonparticipating candidate raises more than $1.8 million, the cap is removed and every dollar in contributions received by the participating candidate is again matched with two additional public dollars. *Id.* The Sixth Circuit reasoned that a candidate could make a "financially rational decision not to participate" in the system only if the candidate "intends to exceed the $1.8 million threshold and believes he will raise more than three times the funds his participating opponents can raise." *Id.* at 948. Nonetheless, the court held that the significant "incentives for participation" did not "step over the line of unconstitutional coercion." *Id.* at 949.

Unlike the Kentucky system at issue in *Gable*, the matching funds provided by North Carolina are given in a one-to-one ratio and are subject to a cap equal to twice the initial trigger amount, which for a 2006 supreme court campaign was $216,650. The incentive to opt for this limited level of public funding (a maximum of $649,950 for a 2006 supreme court general election campaign) is far from unconstitutional coercion, especially in light of the fact that judicial campaigns in several other states have raised and spent multiple millions of dollars. *See* Br. Amici Curiae of Ten Organizations Concerned About the Influence of Money on Judicial Integrity, Impartiality, and Independence, at 5-9; *see also Daggett*, 205 F.3d at 466-472 (upholding public financing system as non-coercive); *Vote Choice*, 4 F.3d at 38-39 (same).

## B.

The thrust of the plaintiffs' First Amendment argument against the matching funds provision is that it "chill[s] and penalize[s] contribu-

tions and independent expenditures made on behalf of [nonparticipating] candidates." Appellants' Br. at 32. The plaintiffs argue that their political speech is chilled because spending in excess of the specified trigger results in public funds being disbursed to a participating candidate whom the plaintiffs do not support. Therefore, according to the plaintiffs, they choose to spend less money (and thus engage in less political speech) in order to prevent candidates they oppose from receiving public funds.

There is some conflict in the circuits as to whether the provision of matching funds burdens or chills speech in a way that implicates the First Amendment. The Eighth Circuit struck down a matching funds provision, reasoning that the potential "self-censorship" created by the scheme "is no less a burden on speech . . . than is direct government censorship." *Day v. Holahan*, 34 F.3d 1356, 1360 (8th Cir. 1994). The First Circuit, on the other hand, explicitly rejected the "logic of *Day*" by holding that the provision of matching funds "does not create a burden" on the First Amendment rights of nonparticipating candidates or independent entities. *Daggett*, 205 F.3d at 464-65; *see also Gable*, 142 F.3d at 947-49 (Sixth Circuit upholding a matching funds scheme against a constitutional challenge without addressing the *Day* analysis).

We conclude that the state's provision of matching funds does not burden the First Amendment rights of nonparticipating candidates (like plaintiff Duke) or independent entities (like plaintiff NCRL-IEPAC) that seek to make expenditures on behalf of nonparticipating candidates. The plaintiffs remain free to raise and spend as much money, and engage in as much political speech, as they desire. They will not be jailed, fined, or censured if they exceed the trigger amounts. The only (arguably) adverse consequence that will occur is the distribution of matching funds to any candidates participating in the public financing system. But this does not impinge on the plaintiffs' First Amendment rights. To the contrary, the distribution of these funds "furthers, not abridges, pertinent First Amendment values" by ensuring that the participating candidate will have an opportunity to engage in responsive speech. *See Buckley*, 424 U.S. at 92-93.

In reaching this conclusion, we reject as unpersuasive the Eighth Circuit's decision in *Day*, which concluded that a matching funds

scheme created an impermissible chilling effect on speech. *Day*'s key flaw is that it equates the potential for self-censorship created by a matching funds scheme with "direct government censorship." *See Day*, 34 F.3d at 1360. *Day* attempts to support this flawed proposition with a citation to a Supreme Court case that addresses the danger of self-censorship that occurs when a licensing statute gives government officials unbridled discretion to permit or deny expressive activity. *Id.* (citing *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757-58 (1988)).

The principle underlying the *Lakewood* case, however, has no application in the context of a matching funds provision. In *Lakewood* the Supreme Court was concerned that speakers would be chilled from expressing criticism of a mayor because a city ordinance gave the mayor broad discretion in granting or denying permits to place news racks on city sidewalks. This danger, according to the Court, justified striking down the licensing scheme, which lacked clear standards. 486 U.S. at 759-60. In the case before us, however, the chilling effect alleged by the plaintiffs is different in kind because it stems not from any fear of direct government censorship but rather from the realization that one group's speech will enable another to speak in response. In stark contrast to the licensing scheme challenged in *Lakewood*, North Carolina's provision of matching funds is likely to result in more, not less, speech.

Moreover, the *Day* decision appears to be an anomaly even within the Eighth Circuit, as demonstrated by that court's later decision in *Rosenstiel v. Rodriguez*, 101 F.3d 1544 (8th Cir. 1996), which upheld a Minnesota campaign finance regulation. A candidate who opts to participate in Minnesota's public financing system must agree to a specified cap on the amount the campaign can spend. However, the cap amount is waved if the participating candidate faces a nonparticipating opponent who raises (or spends) amounts exceeding specified thresholds. 101 F.3d at 1546-48. Had the Eighth Circuit employed the *Day* analysis in the manner the plaintiffs seek to apply it here, the court would have concluded that the provision created a danger of self-censorship because a nonparticipating candidate might choose to limit expenditures in order to ensure that the participating candidate is not released from the expenditure limitations. But, despite a dissent that expressly invoked *Day*'s "chilling effect" proposition, the court

majority upheld the Minnesota provision and reasoned that the provision did not burden a nonparticipating candidate's First Amendment rights. 101 F.3d at 1549-53; *id.* at 1561-62 (Lay, J., dissenting). This outcome, which demonstrates the Eighth Circuit's inconsistent application of the *Day* analysis, provides additional support for our determination that *Day* is simply unpersuasive.

C.

In sum, we conclude that North Carolina's provision of matching funds under § 163-278.67 does not violate the First Amendment because the Act does not coerce candidates into opting into the public financing system. We reject the plaintiffs' argument that the chilling effect allegedly caused by § 163-278.67 makes the statute unconstitutional. To the extent that the plaintiffs (or those similarly situated) are in fact deterred by § 163-278.67 from spending in excess of the trigger amounts, the deterrence results from a strategic, political choice, not from a threat of government censure or prosecution. As the First Circuit observed in *Daggett*, the First Amendment gives the plaintiffs neither a "right to outraise and outspend an opponent" nor a "right to speak free from response." 205 F.3d at 464.

V.

The plaintiffs next argue that § 163-278.66(a)'s reporting requirements are unconstitutional. The section contains two basic requirements. First, nonparticipating candidates are required to file a report within twenty-four hours of raising or spending funds in excess of eighty percent of the trigger amount; independent entities must file a similar report after spending more than $5,000 in opposition to a participating candidate. Second, after this initial report is filed, the candidates and independent entities must disclose each additional amount received (or spent) in excess of $1,000 through additional reports filed under "an expedited reporting schedule."

Reporting and disclosure requirements in the campaign finance realm "must survive exacting scrutiny." *Buckley*, 424 U.S. at 64. The plaintiffs argue that "exacting scrutiny" in this context is equivalent to strict scrutiny (requiring narrow tailoring to a compelling state interest), but this argument is inconsistent with *Buckley* and subse-

quent cases. In *Buckley* the Supreme Court held that there must be "a ‘relevant correlation’ or ‘substantial relation’ between the governmental interest and the information required to be disclosed." 424 U.S. at 64. In applying this test, the Court upheld a FECA disclosure requirement that bore a "sufficient relationship to a substantial governmental interest." 424 U.S. at 80. Likewise, the Court recently upheld BCRA’s disclosure requirements based on its determination that the requirements advanced "important state interests." *McConnell v. FEC*, 540 U.S. 93, 196 (2003). In doing so, the Court did not engage in the type of narrow tailoring analysis that the plaintiffs ask us to apply to the disclosure requirements at issue in this case. *See id.* at 194-202.

The plaintiffs also miss the mark with their argument that the state could advance its interests in a less burdensome manner. Because narrow tailoring is not required, the state need not show that the Act achieves its purposes in the least restrictive manner possible. In *Buckley*, for example, the Supreme Court rejected an argument that FECA’s $10 and $100 thresholds for disclosure of contributions were unconstitutionally low. 424 U.S. at 82-84. The Court reasoned that it could not "require Congress to establish that it has chosen the highest reasonable threshold" that would still achieve the government’s interests. *Id.* at 83. Likewise, our task here is to determine whether North Carolina’s disclosure requirements have a "substantial relation" to the state’s purposes, not to determine whether they are the least restrictive means of advancing those interests.

Moreover, the plaintiffs’ arguments regarding the burdensome nature of § 163-278.66(a) are unfounded. For instance, the plaintiffs complain that § 163-278.66(a) is too burdensome because an initial report must be filed within twenty-four hours after certain threshold spending limits are exceeded. But in *McConnell* the Supreme Court upheld a nearly identical provision that required a report to be filed within twenty-four hours of the date on which expenditures exceeded a trigger amount. 540 U.S. at 195-96. The plaintiffs fare no better with their argument that § 163-278.66(a) is too burdensome because it requires nonparticipating candidates to file an excessive number of reports. The provision authorizes the state board of elections to develop a schedule for the filing of reports. § 163-278.66(a). In 2006, for example, the board set a schedule that required eight reports to be

filed during the two-and-a-half-month period preceding the election. Compliance with this schedule is not particularly burdensome. And, while the plaintiffs are correct that the board could impose a more burdensome schedule in future elections, that possibility alone is not a sufficient basis to strike down the statute at this time.

In sum, the plaintiffs' arguments against the reporting requirements lack merit. As in *Buckley* and *McConnell* the requirements advance three important state interests: "providing the electorate with information, deterring actual corruption and avoiding any appearance thereof, and gathering the data necessary to enforce more substantive electioneering restrictions." *McConnell*, 540 U.S. at 196. By ensuring the release of campaign funding information to the public and enabling the effective administration of matching funds, the reporting requirements clearly demonstrate a "substantial relation" to these interests. Because having a substantial relation to an important state interest is all that is required by *Buckley* and *McConnell*, § 163-278.66(a) passes constitutional muster.[3]

VI.

Finally, the plaintiffs challenge § 163-278.13(e2)(3)'s ban on contributions during the twenty-one days prior to an election. Their central argument is that the twenty-one-day ban cannot withstand strict scrutiny because it is not narrowly tailored to a compelling state interest. The plaintiffs contend first that the stated purpose of the ban, which is to promote the effective administration of the matching funds provisions, is not a compelling interest. Alternatively, they argue that the ban is not narrowly tailored to its stated purpose because it does not bar a nonparticipating candidate from contributing to his own campaign, nor does it bar an independent entity from making expenditures supporting the candidate.

---

[3]The plaintiffs also argue that § 163-278.66(a) is overbroad because it requires the reporting of "obligations made" for future expenditures. Because the reporting of a campaign's future obligations does not encroach on protected speech any more than the reporting of past expenditures, this argument fails as well.

Once again the plaintiffs err in asserting that strict scrutiny applies. In *McConnell* the Supreme Court clearly reiterated that its past cases had subjected restrictions on campaign contributions to less intense scrutiny than restrictions on campaign expenditures. 540 U.S. at 134. Rather than applying strict scrutiny, the Court clarified that "a contribution limit involving even significant interference with associational rights is nevertheless valid if it satisfies the lesser demand of being closely drawn to match a sufficiently important interest." 540 U.S. at 136 (internal quotation marks omitted). Because the contribution ban interferes with associational rights by restricting the time frame during which contributions may be made and received, it must satisfy *McConnell*'s lesser standard of being "closely drawn to match a sufficiently important interest." *See id.*

The Act's twenty-one-day contribution ban survives scrutiny under *McConnell*. The ban advances the state's interest in avoiding the danger of corruption (or the appearance thereof) in judicial elections. The ban advances this interest because it is a key component of the state's public funding system, which is itself designed to promote the state's anti-corruption goals. The Sixth Circuit has upheld a similar ban that covered the twenty-eight days before an election. Noting that the ban forced candidates to "rearrange their fundraising by concentrating it in the period before the 28-Day Window begins," the court reasoned that this restriction was justified under *Buckley* by the state's interest in combating corruption through the use of a public funding scheme. *Gable*, 142 F.3d at 951.

The plaintiffs' alternative argument — that the ban is not sufficiently tailored to its stated goals because it does not cover either a candidate's own contributions or an independent entity's expenditures — also fails. As explained above, perfect tailoring is not required; rather, the ban need only be "closely drawn" to the asserted interest. *See McConnell*, 540 U.S. at 136. This standard is satisfied. A ban on contributions in the period immediately prior to the election helps to minimize a nonparticipating candidate's ability to unfairly take advantage of a participating candidate by delaying contributions until the last minute, when it would be too late for additional matching funds to be disbursed to the participating candidate. Moreover, the ban does not apply in all cases. Instead, it applies only in elections in which a nonparticipating candidate faces a participating candidate.

Even then, it applies only against contributions that would cause the nonparticipating candidate to exceed the trigger for matching funds. § 163-278.13(e2)(3). The narrowness of its application confirms that the ban is closely drawn to the asserted state interests.

In sum, we hold that § 163-278.13(e2)(3) survives constitutional scrutiny. Its ban on contributions from third parties during the twenty-one days prior to an election is a closely drawn means of advancing the state's interest in operating a public funding system to minimize the danger of corruption (or the appearance thereof) in judicial elections.

## VII.

The State of North Carolina has created a system that provides optional public funding for candidates seeking election to the state's appellate courts. The purpose of the system is to protect North Carolina's citizens from "the detrimental effects of increasingly large amounts of money being raised and spent to influence the outcome of [judicial] elections." N.C. Gen. Stat. § 163-278.61. The Act's public funding system is necessary, the state concluded, because the "effects [of money have been] especially problematic in elections of the judiciary, since impartiality is uniquely important to the integrity and credibility of the courts." *Id.* The concern for promoting and protecting the impartiality and independence of the judiciary is not a new one; it dates back at least to our nation's founding, when Alexander Hamilton wrote that "the complete independence of the courts of justice is peculiarly essential" to our form of government. *The Federalist No. 78*, at 426 (E.H. Scott ed., 1898). We conclude that the provisions challenged today, which embody North Carolina's effort to protect this vital interest in an independent judiciary, are within the limits placed on the state by the First Amendment. Accordingly, the district court's judgment dismissing the plaintiffs' claims is

*AFFIRMED*.