**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 23-2164**

———————

SIDDHANTH SHARMA,

        Plaintiff – Appellant,

v.

ALAN HIRSCH, Chairman of NCBOE, in his official capacity; KAREN BRINSON BELL, in his official capacity; JEFF CARMON, in his official capacity; SIOBHAN MILLEN, in his official capacity; STACY EGGERS, IV, in his official capacity; KEVIN LEWIS, in his official capacity; STATE OF NORTH CAROLINA,

        Defendants – Appellees.

———————

Appeal from the United States District Court for the Eastern District of North Carolina at Raleigh.  Richard E. Myers, II, Chief District Judge.  (5:23−cv−00506−M−BM)

———————

Argued:  September 25, 2024                    Decided:  November 14, 2024

———————

Before WILKINSON, RICHARDSON, and RUSHING, Circuit Judges.

———————

Affirmed in part; vacated and remanded in part by published opinion. Judge Wilkinson wrote the opinion in which Judge Richardson and Judge Rushing joined.

———————

**ARGUED:**  Madelyn Strohm, Peyton Mitchell, WAKE FOREST UNIVERSITY SCHOOL OF LAW, Winston-Salem, North Carolina, for Appellant.  Nicholas Scott Brod, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees.  **ON BRIEF:**  John J. Korzen, Maxwell J. Anthony, C. Isaac Hopkin, Luul Y. Lampkins, Appellate Advocacy Clinic, WAKE FOREST UNIVERSITY SCHOOL OF

LAW, Winston-Salem, North Carolina, for Appellant.  Joshua H. Stein, Attorney General, Terence Steed, Special Deputy Attorney General, Mary Carla Babb, Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees.

———————

WILKINSON, Circuit Judge:

The plaintiff here lodges a challenge to the felony-disclosure requirement for a candidate running for federal office in North Carolina. This state law requires that candidates check a box indicating if they have any felony convictions and then submit a short supplemental form with basic information regarding such convictions and the restoration of citizenship rights. The district court upheld the statute. Because the felony-disclosure requirement falls within the Constitution's broad grant of authority to the states to regulate elections, we now affirm. We remand appellant's challenge to a separate address-disclosure requirement to the district court with directions to dismiss that claim as moot.

I.

Siddhanth Sharma ("Sharma") is a twenty-seven-year-old convicted felon who currently resides in Wake County, North Carolina. In September 2023, Sharma announced his candidacy for North Carolina's Thirteenth Congressional District seat in the State's 2024 Republican primary election. Sharma's full citizenship rights had been restored on September 3, 2023, and he registered to vote on September 5. J.A. 233.

Prospective candidates seeking the nomination of a political party in a primary election must submit a notice of candidacy. *See* N.C. Gen. Stat. § 163-106(a); J.A. 91-92. Among other inquiries, the notice form asks, "Have you ever been convicted of a felony?" *Id.* § 163-106(e). Candidates who check "yes" must submit a supplemental form which requires them to list "the name of the offense, the date of conviction, the date of the

restoration of citizenship rights, and the county and state of conviction." *Id.* Failure to fully complete the forms results in the "individual's name [] not appear[ing] on the ballot," and the voiding of all votes cast for that individual. *Id.*

On September 14, 2023, without having submitted his notice of candidacy, Sharma filed suit against members of the North Carolina State Board of Elections ("the State" or "the Board"). He challenged the felony-disclosure requirement as violative of the Qualifications Clause of the U.S. Constitution and challenged both the felony-disclosure requirement and an additional address-disclosure requirement as violative of the First Amendment. He also sought an injunction requiring the State to adopt a notice-of-candidacy form without a felony-disclosure requirement, and another injunction requiring the State to remove all voters' addresses from the voter-search database. J.A. 16-17, 52. The State moved to dismiss his claims for lack of standing and failure to state a claim upon which relief can be granted. J.A. 119.

The district court granted the motion to dismiss. While acknowledging that Sharma had not yet filed his notice-of-candidacy form, the court nonetheless found standing to challenge the felony-disclosure requirement because Sharma alleged a sufficient pre-enforcement injury connected to a constitutional interest. *Sharma v. Hirsch*, No. 23-CV-00506-M, 2023 WL 7406791, at *9 (E.D.N.C. Oct. 30, 2023). However, the district court concluded that felony disclosure did not constitute an additional qualification because it did not render any candidate "ineligible for ballot position." *Id.* at *10 (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 835 (1995)).

4

Likewise, the district court held that the felony-disclosure requirement did not violate the First Amendment. Firstly, applying "exacting scrutiny," the district court held that felony disclosure served a substantial interest in promoting an informed electorate. Secondly, the court found that the requirement posed only a modest burden, and thus the State had significant leeway in light of its legitimate regulatory interests. *Id.* at *11 (citing *John Doe No. 1 v. Reed*, 561 U.S. 186, 196 (2010)).

With regard to the address-disclosure requirement, the district court found that Sharma lacked standing because his injury was insufficiently particularized. Rather, the chilling effect he claimed to experience was "common to all members of the public." *Id.* at *13 n.5 (quoting *Griffin v. Dep't of Lab. Fed. Credit Union*, 912 F.3d 649, 655 (4th Cir. 2019)).

Sharma appealed the district court's dismissal of his challenges on November 2, 2023. J.A. 259. He subsequently submitted his notice of candidacy, correctly noting his felony history, on December 7, 2023, shortly before the December 15 filing deadline. J.A. 22, 260-264. He appeared on the ballot on March 5, 2024, and ultimately lost the primary election.

## II.

We must, as an initial matter, set forth the federalist structure by which the Constitution empowers regulation of elections. Article I's Elections Clause provides that

> [t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators.

5

U.S. CONST. art I, § 4, cl. 1. Under this scheme, the states "have a major role to play in structuring and monitoring the election process, including primaries." *Cal. Democratic Party v. Jones*, 530 U.S. 567, 572 (2000); *see also Moore v. Harper*, 600 U.S. 1, 10 (2023) ("The Clause imposes on state legislatures the duty to prescribe rules governing federal elections." (internal quotation marks omitted)). The Supreme Court has defined permissible state election laws broadly as "the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved." *Smiley v. Holm*, 285 U.S. 355, 366 (1932). "It cannot be doubted that these comprehensive words embrace authority to provide a complete code for congressional elections, [encompassing] . . . notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns." *Id.*

While state discretion has the potential to lead to nonuniform practices in the methods of selecting federal officers, such flexibility is an intended feature of the Elections Clause, not a flaw. Indeed, in the years preceding ratification of the Constitution, states traditionally held near absolute authority over the selection of delegates to nationally relevant political bodies. For example, the colonies and states customarily selected delegations to the First and Second Continental Congresses, the Congress under the Articles of Confederation, and the Constitutional Convention. *See, e.g.*, JACK N. RAKOVE, THE BEGINNINGS OF NATIONAL POLITICS: AN INTERPRETIVE HISTORY OF THE CONTINENTAL CONGRESS 30-31 (1979); ARTICLES OF CONFEDERATION OF 1781, art. V,

6

para. 3 ("Each state shall maintain its own delegates in a meeting of the states, and while they act as members of the committee of the states."); New York Assembly Resolution on the Appointment of Delegates to the Constitutional Convention (Feb. 26, 1787), in 4 THE PAPERS OF ALEXANDER HAMILTON 101-02 (Harold C. Syrett ed. 1962).

The Constitution thus reflected this American ethos of state influence over the selection of national representatives. While the states would cede much of their sovereignty to the federal government, they gained certain rights, including the "broad power" to prescribe the "Times, Places, and Manner" of holding federal elections. *Clingman v. Beaver*, 544 U.S. 581, 586 (2005) (quoting *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986)). This was a federalist compromise: the Constitution provided basic qualifications which the states could not discard or alter, but otherwise afforded states significant latitude to implement voter qualifications, ensure that elections ran smoothly, that candidates met their constitutional requirements, and that voters were properly informed. *See Storer v. Brown*, 415 U.S. 724, 730 (1974) (discussing states' "comprehensive" election codes and that "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes").

This compromise did not serve to appease all concerns over the loss of state sovereignty, but it was an acknowledgement that state governments were well equipped to respond to the needs of their electorates. No uniform system of elections would suit both Rhode Island and Virginia equally. For the Founders or Congress to attempt to delve into every minutia of federal elections would be folly. State governments operated closer to the

7

ground and could devise electoral regulations responsive to the different geographic and demographic character of their populaces. *See generally* AKHIL REED AMAR, THE LAW OF THE LAND 165-280 (2015) (highlighting how these differences impacted constitutional interpretation and lawmaking).

While states are afforded great berth in devising proper electoral processes, they are not without limit in this field. States must yield to other constitutional provisions that protect the rights of voters and candidates. Beyond their inability to create new qualifications for officeholding, states cannot discriminate against candidates or voters on the basis of race, nor can they attempt to dissuade or compel political affiliation with specific groups. *See, e.g.*, *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008); *Clingman*, 544 U.S. at 586-87. Regulation of elections within the states proceeds, for example, subject to the First, Fourteenth, and Fifteenth Amendments. State authority, while broad, is not absolute.

When states do not otherwise violate constitutional rights and requirements, only Congress may supersede their discretionary authority. Perhaps the chief congressionally imposed limit on the states is the Voting Rights Act, but this statute is not at issue today. Congress in this case has been silent. "The [Elections] Clause is a default provision; it invests the States with responsibility for the mechanics of congressional elections" insofar as "Congress declines to preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997); *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8-9 (2013).

And even then, Congress's authority cannot be considered apart from its historical purpose. The Elections Clause's "grant of congressional power was the Framer's insurance

8

against the possibility that a State would refuse to provide for the election of representatives to the Federal Congress." *Inter Tribal Council of Ariz.*, 570 U.S. at 8; *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n* ("*AIRC*"), 576 U.S. 787, 815 (2015). As Alexander Hamilton put it, Congress should possess the basic power to "regulate, *in the last resort*, the election of its own members." FEDERALIST NO. 59 (1788) (C. Rossiter ed. 1961) (emphasis added); *see also* 2 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 437 (Merrill Jensen et al. eds., 1976) ("Sir, let it be remembered that this power can only operate in a case of necessity, after the factious or listless disposition of a particular state has rendered an interference essential to the salvation of the general government." (quoting Pennsylvania Ratification Convention Debates (Nov. 30, 1788) (statement of Jasper Yeates))).

The nuanced balance of congressional and state authority over electoral procedures provides no green light for federal courts to devise preferences of their own. Indeed, a "dominant purpose of the Elections Clause" was to create a possible pathway for *congressional* preemption and not to otherwise "restrict the ways States enact legislation." *AIRC*, 576 U.S. at 814-15. We cannot strain the intent and meaning of state election laws to find constitutional violations where there are none. As the constitutional text highlights, the proper venue for debates over discretionary state election policies remains with Congress, more so than with the federal courts. *See* U.S. CONST. art. I, § 4, cl. 1; *see also Alexander v. S.C. State Conf. of the NAACP*, 144 S. Ct. 1221, 1258 (2024) (Thomas, J., concurring in part) ("The Framers' considered choice of a nonjudicial remedy is highly relevant context to the interpretation of the Elections Clause.").

9

III.

A.

The above analysis of state electoral authority provides the context for addressing the central question in this appeal: does a requirement for the public disclosure of candidates' felony histories, which will not appear on the ballot, constitute an impermissible qualification for office.[1] For the following reasons, we must answer that question in the negative.

The federal Constitution provides an exclusive list of the qualifications for congressional office. "No Person shall be a Representative who shall not have attained to

---

[1] The issue here is one that is "capable of repetition, yet evading review." *S. Pac. Term. Co. v. ICC*, 219 U.S. 498, 515 (1911).

"Election-related disputes qualify as 'capable of repetition' when 'there is a reasonable expectation that the challenged provisions will be applied against the plaintiffs again during future election cycles.'" *Lux v. Judd*, 651 F.3d 396, 401 (4th Cir. 2011) (quoting *N.C. Right to Life Comm. Fund for Indep. Political Expenditures v. Leake*, 524 F.3d 427, 435 (4th Cir. 2008)). And the Supreme Court has repeatedly instructed that the exception is especially appropriate when mootness would have otherwise been the result of a completed election cycle. *See Storer v. Brown*, 415 U.S. 724, 737 n.8 (1974); *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 462 (2007); *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 735 (2008).

It is unusual that a plaintiff comes before our court having already established repetition, but Sharma has done so. He brought nearly identical claims in a case about the 2022 Republican primary election for the same seat in the U.S. House of Representatives. *See Sharma v. Circosta*, No. 22-CV-59, 2023 WL 3437808, at *1 (E.D.N.C. May 11, 2023), *aff'd in part, appeal dismissed in part*, No. 23-1535, 2024 WL 771697 (4th Cir. Feb. 26, 2024) (per curiam). Where repeated conduct is before the court in the present, the prospect of future repetition becomes all the more likely. And now, Sharma has publicly declared his intent to run again in the next congressional election. Siddhanth Sharma, X (formerly TWITTER) (Mar. 6, 2024), https://perma.cc/UT37-CBW3 ("I bet you will not see 14 candidates on the ballot next time, but you WILL see me."). At that time, he will face the same felony-disclosure requirement and the same dilemma of fully litigating this challenge before the December notice-of-candidacy filing period ends.

the Age of twenty five Years, and been seven Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State in which he shall be chosen." U.S. CONST. art. I, § 2, cl. 2. And, since *Powell v. McCormack*, the Supreme Court has continually affirmed the "Framers' understanding that the qualifications for members of Congress had been fixed in the Constitution." 395 U.S. 486, 541 (1969); *see also U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 796-97 (1995); JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES §§ 623-628 (1833) ("It would seem but fair reasoning upon the plainest principles of interpretation, that when the [C]onstitution established certain qualifications, as necessary for office, it meant to exclude all others, as prerequisites.").

States have no authority under the Elections Clause to pass qualifications masquerading as time, place, and manner regulations. *See Thornton*, 514 U.S. at 832-33; STORY, *supra*, § 624. However, the Framers were concerned primarily with the categorical exclusion of certain citizens from officeholding, including religious qualifications and district residency qualifications. STORY, *supra*, §§ 623, 628. The Qualifications Clause was not designed to restrict states from passing reasonable procedural measures that individuals must complete to formalize their candidacy.

Today, courts read the Qualifications Clause with a slightly broader lens to cover two types of government regulations: (1) laws that exclude or effectively exclude a candidate from the ballot, *see, e.g.*, *Thornton*, 514 U.S. at 831, and (2) laws that publicly disadvantage certain political viewpoints on the face of the ballot, *see, e.g.*, *Cook v. Gralike*, 531 U.S. 510, 524-25 (2001).

11

Even under this more capacious framework, the felony-disclosure requirement is not a disqualification at all. If prospective candidates possess a felony history, they may still appear on the federal ballot, regardless of whether their full citizenship rights have been restored. *See* J.A. 127 & n.4. In this respect, the felony-disclosure requirement could not be more different than the term-limit requirement held unconstitutional in *United States v. Thornton*. There, Arkansas had amended its constitution to preclude any individual who had previously served two or more terms in the U.S. Senate from appearing on the ballot for that same position. *Thornton*, 514 U.S. at 784. While the Supreme Court acknowledged the possibility that a former senator or two-term incumbent could still be reelected with write-in ballots, it held that precedents supporting "manner" regulations did not enable states to completely eliminate all avenues to "ballot access." *Id.* at 835. To comply with the Arkansas Constitution necessarily meant, in *Thornton*'s view, exclusion from the ballot. However, Sharma's compliance with the felony-disclosure requirement—a simple checkbox and half-page form—enabled him to appear on the ballot.

Likewise, the felony-disclosure requirement did not derogatorily brand Sharma for his political viewpoints. The Court in *Cook v. Gralike* held that Missouri exceeded its power under the Elections Clause when it required that ballots include candidates' positions and congressional voting histories on proposed term limits. 531 U.S. at 514-15. "Adverse [ballot] labels handicap candidates 'at the most crucial stage in the election process—the instant before the vote is cast,'" and thus seek to impermissibly "dictate electoral outcomes." *Id.* at 525-26 (first quoting *Anderson v. Martin*, 375 U.S. 399, 402 (1964); then quoting *Thornton*, 514 US. at 833-34).

12

North Carolina's felony-disclosure requirement in no way disadvantages political viewpoints. The disclosure is the mere repetition of a simple fact contained in the public record. *See State v. Sharma*, No. COA19-591, 2020 WL 7350699, at *1, 5 (N.C. Ct. App. Dec. 15, 2020). Unlike the disclosure in *Cook*, the felony disclosure does not reveal anything about Sharma's personal philosophy or opinions on public policy. And significantly, the felony disclosure does not appear on the ballot. To view it, voters must solicit the completed notice-of-candidacy form, which does not appear to be downloadable from the State's website. Thus Sharma cannot claim that North Carolina seeks to influence voters at the "instant before the vote is cast." *Cook*, 531 U.S. at 525 (quoting *Martin*, 375 U.S. at 402).

Being no form of unconstitutional qualification, the felony-disclosure requirement is a proper exercise of North Carolina's "time, place, and manner" regulatory power. *Thornton* and *Cook* explicitly permit "manner" regulations that "encompass[] matters like 'notices, registration, . . . protection of voters, [and] prevention of fraud and corrupt practices." *Cook*, 531 U.S. at 523-24 (quoting *Smiley*, 285 U.S. at 366); *see Thornton*, 514 U.S. at 834-35. Disclosing past histories of lawbreaking in a prospective lawmaker falls within the ambit of permissible safeguards necessary to "ensur[e] that elections are 'fair and honest,' and 'that some sort of order, rather than chaos is to accompany the democratic process.'" *Cook*, 531 U.S. at 524 (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)).

13

B.

Sharma also claims that North Carolina's felony-disclosure requirement is a form of compelled speech violative of the First Amendment. Under *Anderson/Burdick*, determining the appropriate standard of review requires that we examine the "character and magnitude" of the burden on Sharma's First Amendment rights:

> [W]hen those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions.

*Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (first quoting *Norman v. Reed,* 502 U.S. 279, 289 (1992); then quoting *Anderson*, 460 U.S. at 788); *accord Fusaro v. Cogan*, 930 F.3d 241, 256-58 (4th Cir. 2019).

The felony-disclosure requirement imposes only the lightest burden on Sharma's rights. Why? Because the speech this disclosure compels is relatively innocuous. The disclosure does not cover candidates' personal beliefs, policy preferences, or political affiliations. Sharma remains free to speak as he pleases and on any topic he selects. If the felony-disclosure requirement compromised political expression, Sharma would be right in insisting that we apply "exacting scrutiny," *see Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607-08 (2021); however, no such issue is at play here. As discussed above, N.C. Gen. Stat. § 163-106(e) only requires disclosure of a simple historical fact illustrative of nonpolitical activity. A fact already available to the public to boot.

14

Thus we ask only whether the felony disclosure requirement is sufficiently justified by "the State's important regulatory interests." *Burdick*, 504 U.S. at 434. Our precedent is clear that "[t]here can be no question about the legitimacy of the State's interest in fostering informed and educated expressions of the popular will." *Anderson*, 460 U.S. at 796; *Tashjian*, 479 U.S. at 220; *Wash. State Grange*, 552 U.S. at 458 ("The State's asserted interest in providing voters with relevant information about the candidates on the ballot is easily sufficient to sustain I–872."). Here, the state is making already available public information more accessible to voters upon inquiry—an element beneficial to maintaining an educated electorate.

Informing and educating voters with relevant information about the candidates is thus a recognized state interest, and the felony disclosure may be viewed as a reasonable assist to that endeavor. The state is using the requirement to emphasize in a modest and restrained manner that lawmaking and lawbreaking are, to put it gently, in tension. North Carolina is not passing judgment on whether the electorate should ultimately vote for Sharma or indeed for any candidate with a comparable history. The felony-disclosure requirement simply allows voters to reach their own conclusions on a distinction that is, at its core, the very essence of the rule of law. We therefore hold that the felony-disclosure requirement survives *Anderson/Burdick* balancing.

## IV.

We need not reach the merits of Sharma's challenge to the address-disclosure requirement as we lack jurisdiction over this claim. Our court may raise jurisdictional

15

questions *sua sponte* at "any stage of proceedings." *United States v. Springer*, 715 F.3d 535, 540 (4th Cir. 2013); *see also North Carolina v. Rice*, 404 U.S. 244, 246 (1971). Here, we lack jurisdiction because the issue is now moot.

Upon registering to vote, Sharma, like all other North Carolina voters, disclosed the address of his personal residence. *See* N.C. Gen. Stat. § 163-82.7(c)-(f) (detailing the State's address verification process). Once a voter is registered, their verified address is stored in the State's publicly accessible voter-search database. Thus any individual with internet access can currently locate a registered voter's address.

Our jurisdiction under Article III is limited to "live" cases and controversies. *Powell*, 395 U.S. at 496; *accord Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003). Even assuming a litigant establishes standing at the outset of litigation, the "case is moot if, at any point prior to the case's disposition, one of the elements essential to standing, like injury-in-fact, no longer obtains." *Am. Fed'n of Gov't Emps. v. Off. of Special Couns.*, 1 F.4th 180, 187 (4th Cir. 2021). If a plaintiff does not retain such a "'personal stake in the outcome of the lawsuit' throughout the entire litigation," this court lacks jurisdiction to hear the case. *United States v. Payne*, 54 F.4th 748, 751 (2022) (quoting *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 160-61 (2016)).

Because the 2024 primary election cycle has already concluded, Sharma lacks a "concrete interest" in this Court's disposition on his address-disclosure requirement. *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (quoting *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012)). While Sharma claims that the address-disclosure requirement has a chilling effect on those running for office, he did indeed submit his notice

16

of candidacy, run for office, and appear on the ballot. And on March 5, 2024, Sharma lost the Republican primary election. Enjoining the state from publishing his address now will not negate any past compelled speech or chilling effects, nor change the results of the election. The deed has been done. Sharma "can no longer benefit from the relief he seeks." *Payne*, 54 F.4th at 752.

The issue is also not "capable of repetition." *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 462 (2007) (requiring "a reasonable expectation that the same complaining party will be subject to the same action again" (quoting *Spencer v. Kemna*, 523 U.S. 1, 17 (1998))). Future candidates will not be compelled to reveal their address. The Board conceded at oral argument that North Carolina will not and cannot mandate that candidates for federal office be registered voters because such a requirement would constitute an unconstitutional additional qualification on officeholding. Thus any candidate who objects to providing his address may simply cancel his voter registration or avoid registering altogether. If a candidate still voluntarily enters or remains within the voter-search database, he cannot reasonably claim that such speech was compelled, given that he had a reasonable and easily accessible alternative. Any potential "chilling effect" will be "self-inflicted," and thereby untraceable to the Board's requirements. *See Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 418 (2013).

V.

17

Over the past five years, North Carolina has been flooded with dozens of challenges to the State's electoral regulations. We understand that many of these challenges are reasonably grounded in the law, and their gravity should not be understated. At the same time, the constant pull to the courtroom leaves state election officials frequently operating in a provisional state, never knowing if and when their procedures will be overturned.

This state of affairs is not conducive to the most efficient administration of elections. "[R]unning a statewide election is a complicated endeavor. Lawmakers [] must make a host of difficult decisions about how best to structure and conduct the election." *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 31 (2020) (mem.) (Kavanaugh, J., concurring in denial of application to vacate stay). Often, a board of elections must either choose to forego policies that serve significant governmental interests in preserving electoral integrity, or risk enforcing potentially unconstitutional measures that could throw a shadow over an entire federal election. Neither option is desirable. "When an election is close at hand, the rules of the road should be clear and settled." *Id.* And some modicum of stability assists candidates in knowing when and where they will run, and voters in knowing who would represent them. These lines of communication are important to representative government, and their value is among those things that courts may keep in mind. Both the stability of state electoral procedures and the place of state governments in the Article I elections scheme are under challenge in these sorts of cases, but here again the courts may, under law, take account of both.

18

We affirm the district court's holding that North Carolina's felony-disclosure requirement is constitutional. We vacate the judgment on the address-disclosure challenge and remand that claim to the district court with instructions to dismiss it as moot.

*AFFIRMED IN PART; VACATED AND REMANDED IN PART*